UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff and Counterdefendant,<br>v.<br><br><br>FEATURE FILMS FOR FAMILIES, INC.,<br><br>CORPORATIONS FOR CHARACTER, L.C.,<br><br>and<br><br>FAMILY FILMS OF UTAH, INC.,<br><br>and<br><br>FORREST SANDUSKY BAKER III,<br>        individually and as owner and principal<br>        officer of FEATURE FILMS FOR<br>        FAMILIES, INC., CORPORATIONS<br>        FOR CHARACTER, L.C., and<br>        FAMILY FILMS OF UTAH, INC.,<br><br>    Defendants and Counterclaimants. | **Case No. 11-197**<br><br>**ANSWER, COUNTERCLAIMS, AND JURY DEMAND OF DEFENDANTS FEATURE FILMS FOR FAMILIES, INC., CORPORATIONS FOR CHARACTER, L.C., AND FAMILY FILMS OF UTAH, INC.** |

Defendants and Counterclaimants Feature Films for Families, Inc. ("Feature Films"), Corporations for Character, L.C. ("C4C"), and Family Films of Utah, Inc. ("Family Films") (collectively, the "Corporate Defendants") hereby submit their Answer and Counterclaims in response to Plaintiff United States of America's Complaint and respond as follows:

1.      Paragraph 1 contains a legal recitation to which no response is required. To the extent a response is required, the Corporate Defendants deny the same.

## JURISDICTION AND VENUE

2.      Corporate Defendants do not dispute that this Court has subject matter jurisdiction, but deny that this is a "proper case" for application of Section 53(b).

3.      Corporate Defendants deny the allegations in paragraph 3 of the Complaint.

## DEFENDANTS

4.      Corporate Defendants admit that Feature Films for Families, Inc. is a Utah for-profit corporation with its principal place of business located at 5286 South Commerce Drive, Suite A116, Murray, Utah.

5.      Corporate Defendants admit that Corporations for Character, L.C. is a Utah for-profit corporation with its principal place of business located at 5286 South Commerce Drive, Suite A116, Murray, Utah.

6.      Corporate Defendants admit that Family Films of Utah, Inc. is a Utah for-profit corporation with its principal place of business located at 5286 South Commerce Drive, Suite A116, Murray, Utah, and that Family Films provides certain management services to Feature Films and C4C, which services have changed during the relevant time period alleged in the Complaint.

7.      Corporate Defendants admit that Baker is the president and chief executive officer of Feature Films and the chief executive officer of Family Films. The remaining allegations contained in paragraph 7 of the Complaint are denied.

8.      Corporate Defendants admit the allegations contained in paragraph 8 of the Complaint to the extent they relate to Feature Films, C4C and Family Films.  The Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the remaining allegations contained in paragraph 8 of the Complaint with regard to defendant Forrest Baker and therefore deny them.

2

9.     Corporate Defendants admit that Feature Films transacts and has transacted business in this District by marketing and selling family-friendly movies in this District.  Corporate Defendants admit that C4C transacts and has transacted business in this District by acting as a professional fundraising agent, which solicited potential donors in this District for charitable contributions for charities and nonprofit entities.  Corporate Defendants admit that C4C is registered as a professional solicitor in Florida and has contracted with two related charities in this District to solicit contributions.   The remaining allegations contained in paragraph 9 of the Complaint are denied to the extent they relate to Feature Films, C4C and Family Films. Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 9 of the Complaint with regard to defendant Forrest Baker and therefore deny them.

## DEFENDANTS' BUSINESS ACTIVITIES

10.     Corporate Defendants admit that C4C  since at least 2008 has solicited charitable contributions for nonprofit organizations using the telephone, that Feature Films since at least 2007 has marketed and sold family-friendly movies using the telephone, and both have used interstate telephone calls to do so.  The allegations contained in paragraph 10 are denied to the extent they relate to Family Films.  Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 10 of the Complaint with respect to defendant Forrest Baker and therefore deny them.

11.     Corporate Defendants admit that Feature Films acquires, produces, and distributes family-friendly films on DVD.  Corporate Defendants admit that Feature Films uses telephone calls to consumers in the United States to market and sell DVDs.   The remaining allegations

contained in paragraph 11 are a legal conclusion to which no response is required or are otherwise denied.

12.      Corporate Defendants admit that C4C initiates telephones calls to solicit contributions for charities and nonprofits.  The remainder of the allegations contained in paragraph 12 of the Complaint are denied.

13.      Corporate Defendants admit that Family Films provides certain management services to Feature Films and C4C, which services have changed during the relevant time period alleged in the Complaint.  The remainder of the allegations contained in paragraph 13 of the Complaint are denied.

14.      The allegations contained in paragraph 14 of the Complaint are denied.

15.      The allegations contained in paragraph 15 of the Complaint are denied.

16.      The allegations contained in paragraph 16 of the Complaint are denied.

**Telemarketing to Promote FFF DVDs and Baker's Movie**

17.      The allegations contained in paragraph 17 of the Complaint are denied.

**1. Telephone Calls by C4C Selling FFF DVDs**

18.      The allegations contained in paragraph 18 of the Complaint are admitted in part, subject to the qualification that the agreements referenced in this paragraph speak for themselves.   In so much as the factual allegations in this paragraph are inconsistent with the terms of the referenced agreements, they are denied.

19.      The allegations contained in paragraph 19 of the Complaint are denied.

20.      Corporate Defendants admit that during 2008 and 2009, C4C engaged in a fundraising campaign on behalf of the organization Kids First, as Kids First's agent, and as Kids First's

agent, identified that the calls were being made by Kids First.  The remaining allegations contained in paragraph 20 of the Complaint are denied.

21.     Corporate Defendants admit that during 2008 and 2009, C4C engaged in a fundraising campaign on behalf of the organization Kids First, to inform families about Kids First's charitable programs and invite them to initially just serve as Kids First volunteers to help create a recommended viewing list of family-friendly films, and that families that agreed to serve as Kids First volunteers were sent two free, family-friendly movies on DVDs clearly identified with the Kids First logo and were asked to watch the DVDs and further agree to receive a second telephone call to answer questions about their experience.  The remaining allegations contained in paragraph 21 of the Complaint are denied.

22.     Corporate Defendants admit that during 2008 and 2009, C4C engaged in a fundraising campaign on behalf of the organization Kids First, and in follow up telephone calls to persons who had agreed to serve as Kids First volunteers and were sent two free, family-friendly movies and asked to watch the DVDs and agreed to receive a second telephone call to answer questions about their experience,  C4C representatives (on behalf of Kids First) asked the volunteers several questions about the movies they had watched designed to help Kids First complete a recommended viewer list of family-friendly films, and also invited its volunteers to support this Kids First project by purchasing two additional family-friendly films for $12.95, explaining that the proceeds would go to help fund the program and complete the process of creating the recommended viewing list, which necessarily included the cost of the calling campaign itself (long distance telephone calls, postage, and the manufacture of DVDs).  The remaining allegations contained in paragraph 22 of the Complaint are denied.

23.     The allegations contained in paragraph 23 of the Complaint are denied.

24.     Corporate Defendants admit that Feature Films was paid the amount it was contractually entitled to for providing fulfillment services and was reimbursed from the proceeds of the C4C calls made as an agent for Kids First during 2008 and 2009.  The remaining allegations contained in paragraph 24 are denied.

25.     Corporate Defendants admit that C4C made calls exempt from the requirements of the National Do No Call List, as stated in the first sentence of paragraph 25 of the Complaint.  With respect to the second sentence of paragraph 25, the audio recordings and scripts produced by Defendant C4C to the FTC speak for themselves as to what was communicated during the telephone calls. In so much as the allegations contained in paragraph 25 of the Complaint are inconsistent with such audio recordings and scripts, they are denied.

26.     The allegations contained in paragraph 26 of the Complaint are denied.

## 2. FFF Telephone Calls Promoting *The Velveteen Rabbit*

27.     The allegations contained in paragraph 27 of the Complaint are denied.

28.      Corporate Defendants admit that Feature Films representatives made informational telephone calls to households in areas where *The Velveteen Rabbit* was screened in theatres to let them know about the theatrical release of the movie and support family-friendly entertainment. The audio recordings and scripts produced by Defendant Feature Films to the FTC speak for themselves as to what was communicated during the telephone calls. In so much as the allegations contained in paragraph 28 of the Complaint are inconsistent with such audio recordings and scripts, they are denied.

29.     The allegations contained in paragraph 29 of the Complaint are denied.

30.     Corporate Defendants admit that Feature Films representatives made informational telephone calls regarding *The Velveteen Rabbit*, and because such calls are exempt from the

National Do Not Call list, Feature Films did not limit the calls.  The audio recordings and scripts produced by Defendant Feature Films to the FTC speak for themselves as to what was communicated during the telephone calls. The remaining allegations contained in paragraph 30 of the Complaint  are denied.

31.     The allegations contained in paragraph 31 of the Complaint are denied.

32.     Corporate Defendants admit that Feature Films provided information in telephone calls about *The Velveteen Rabbit*.  The audio recordings and scripts produced by Defendant Feature Films to the FTC speak for themselves as to what was communicated during the telephone calls. In so much as the allegations contained in paragraph 32 of the Complaint are inconsistent with such audio recordings and scripts, they are denied.

33.     Corporate Defendants admit that Feature Films used the caller identification phrases "VELVETEEN" or "VELVETEENMOV" when making the informational telephone calls regarding *The Velveteen Rabbit*.  The remainder of the allegations contained in paragraph 33 of the Complaint are denied.

### 3. FFF Telephone Calls to Sell DVDs

34.     The allegations contained in paragraph 34 of the Complaint are admitted.

35.     Corporate Defendants admit that Feature Films made telephone calls to sell Feature Films DVDs to persons whose telephone numbers were listed on the National Do Not Call Registry as stated in paragraph 35 of the Complaint, but deny that such calls violated the Telemarketing Sales Rule.

36.     Corporate Defendants admit that Feature Films made telephone calls to sell Feature Films DVDs to persons whose telephone numbers were listed on the National Do Not Call Registry as stated in paragraph 36 of the Complaint, but deny that such calls violated the Telemarketing Sales Rule.

37.     Corporate Defendants admit that Feature Films used multiple caller identification names during campaigns to sell Feature Films DVDs.  The remaining allegations contained in paragraph 37 of the Complaint are denied.

### Telemarketing for Contributions

38.     Corporate Defendants admit that C4C is a professional solicitor for nonprofits and charities and made telephone calls seeking contributions and advocating on their behalf. The remaining allegations contained in paragraph 38 of the Complaint are denied.

39.     Corporate Defendants admit that C4C is compensated for the professional solicitation services it provides to nonprofits and charities,  and that that compensation is set by contract, which contracts speak for themselves.  In so much as the factual allegations contained in paragraph 39 of the Complaint are inconsistent with the terms of the referenced contracts, they are denied.

40.     Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 40 of the Complaint therefore deny them.

41.     The audio recordings and scripts produced by Defendant C4C to the FTC speak for themselves as to what was communicated during various individual charitable solicitation campaigns, none of which are specifically identified in paragraph 41 of the Complaint.  In so much as the allegations contained in paragraph 41 of the Complaint are inconsistent with such audio recordings and scripts, they are denied.

42.     The audio recordings and scripts produced by Defendant C4C to the FTC speak for themselves as to what was communicated during various individual charitable solicitation campaigns, none of which are specifically identified in paragraph 42 of the Complaint. In so much as the allegations contained in paragraph 42 of the Complaint are inconsistent with such audio recordings and scripts, they are denied.

43.     The allegations contained in paragraph 43 of the Complaint are denied.

44.     Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the remaining allegations contained in paragraph 44 of the Complaint therefore deny them.

45.     Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 45 of the Complaint therefore deny them.

46.     The allegations contained in paragraph 46 of the Complaint are denied.

47.     The allegations contained in paragraph 47 of the Complaint are admitted.

**Do-Not-Call Requests Directed to the Family Films Enterprise**

48.     The allegations contained in paragraph 48 of the Complaint are admitted.

49.     The allegations contained in paragraph 49 of the Complaint are denied.

**Family Films Enterprise's Use of Predictive Dialer Technology**

50.     The allegations contained in paragraph 50 of the Complaint are admitted to the extent they relate to Family Films, Feature Films, and C4C, except Corporate Defendants deny that there is such a thing as the "Family Films Enterprise."

51.     Corporate Defendants admit that at times, telephone calls were abandoned, but deny that the pattern of abandoned calls violates the Telemarketing Sales Rule. The remaining allegations contained in paragraph 50 of the Complaint are denied.

**VIOLATIONS OF SECTION 5 OF THE FTC ACT**

52.     Paragraph 52 contains a legal recitation to which no response is required. To the extent a response is required, Corporate Defendants deny the same.

53.     Paragraph 53 contains a legal conclusion to which no response is required. To the extent a response is required, Corporate Defendants deny the same.

## COUNT I
### *Deceptive Representations*

54.     The audio recordings and scripts produced by Corporate Defendants Feature Films and C4C to the FTC speak for themselves as to what was communicated during various individual campaigns, none of which are specifically identified in paragraph 54 of the Complaint.  In so much as the allegations contained in paragraph 54 of the Complaint are inconsistent with such audio recordings and scripts, they are denied. The allegations contained in paragraph 54 of the Complaint are also denied to the extent they relate to Family Films.  Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 54 of the Complaint with respect to defendant Forrest Baker and therefore deny them.

55.     The allegations contained in paragraph 55 of the Complaint are denied.

56.     The allegations contained in paragraph 56 of the Complaint are denied.

### THE TELEMARKETING SALES RULE
### AND THE NATIONAL DO NOT CALL REGISTRY

57.     Paragraph 57 contains a legal recitation to which no response is required. To the extent a response is required, Corporate Defendants deny the same.

58.     Paragraph 58 contains a legal recitation to which no response is required. To the extent a response is required, Corporate Defendants deny the same.

59.     Paragraph 59 contains a legal recitation to which no response is required. To the extent a response is required, Corporate Defendants deny the same.

60.     Paragraph 60 contains a legal recitation to which no response is required. To the extent a response is required, Corporate Defendants deny the same.

61.     The first sentence of Paragraph 61 contains a legal recitation to which no response is required.  Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the allegations contained in the second sentence of paragraph 61 and put the government to its proof.

62.     Paragraph 62 contains a legal recitation to which no response is required. To the extent a response is required, Corporate Defendants deny the same.

63.     Paragraph 63 contains a legal recitation to which no response is required. To the extent a response is required, Corporate Defendants deny the same.

64.     Paragraph 64 contains a legal recitation to which no response is required. To the extent a response is required, Corporate Defendants deny the same.

65.     Paragraph 65 contains a legal recitation to which no response is required. To the extent a response is required, Corporate Defendants deny the same.

66.     Paragraph 66 contains a legal recitation to which no response is required. To the extent a response is required, Corporate Defendants deny the same.

67.     Paragraph 67 contains a legal recitation to which no response is required. To the extent a response is required, Corporate Defendants deny the same.

68.     Paragraph 68 contains a legal recitation to which no response is required. To the extent a response is required, Corporate Defendants deny the same.

69.     Paragraph 69 contains a legal recitation to which no response is required. To the extent a response is required, Corporate Defendants deny the same.

70.     Paragraph 70 contains a legal recitation to which no response is required. To the extent a response is required, Defendant denies the same.

**COUNT II**
*Making False Statements in Connection with Telemarketing*

71.     The allegations contained in paragraph 71 of the Complaint are denied to the extent they relate to Feature Films, C4C or Family Films.   Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 71 of the Complaint with respect to defendant Forrest Baker and therefore deny them.

72.     The allegations contained in paragraph 72 of the Complaint are denied to the extent they relate to Feature Films, C4C or Family Films.   Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 72 of the Complaint with respect to defendant Forrest Baker and therefore deny them.

**COUNT III**
*Violating the National Do Not Call Registry*

73.     The allegations contained in paragraph 73 of the Complaint are denied to the extent they relate to Feature Films, C4C or Family Films.   Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 73 of the Complaint with respect to defendant Forrest Baker and therefore deny them.

**COUNT IV**
*Ignoring Entity-Specific Do Not Call Requests*

74.     The allegations contained in paragraph 74 of the Complaint are denied to the extent they relate to Feature Films, C4C or Family Films.   Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 74 of the Complaint with respect to defendant Forrest Baker and therefore deny them.

## COUNT V
### *Failing to Transmit Information to Caller Identification Services*

75.     The allegations contained in paragraph 75 of the Complaint are denied to the extent they relate to Feature Films, C4C or Family Films.   Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 75 of the Complaint with respect to defendant Forrest Baker and therefore deny them.

## COUNT VI
### *Failing to Make Required Oral Disclosures*

76.     The allegations contained in paragraph 76 of the Complaint are denied to the extent they relate to Feature Films, C4C or Family Films.   Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 76 of the Complaint with respect to defendant Forrest Baker and therefore deny them.

77.     The allegations contained in paragraph 77 of the Complaint are denied to the extent they relate to Feature Films, C4C or Family Films.   Corporate Defendants are without sufficient information or knowledge to form a belief as to the truth of the allegations contained in paragraph 77 of the Complaint with respect to defendant Forrest Baker and therefore deny them.

## COUNT VII
### *Abandoning Calls*

78.     Corporate Defendants admit that Feature Films and C4C have, like every other telemarketer who uses predictive dialing technology, on occasion abandoned outbound telephone calls, but deny that any such abandonment constituted a violation of the TSR.  The allegations contained in paragraph 78 of the Complaint are denied to the extent they relate to Family Films. Corporate Defendants are without sufficient information or knowledge to form a belief as to the

truth of the allegations contained in paragraph 78 of the Complaint with respect to defendant

Forrest Baker and therefore deny them.

## INJURY TO THE PUBLIC INTEREST

79.     The allegations contained in paragraph 79 of the Complaint are denied.

## THIS COURT'S POWER TO GRANT RELIEF

80.     Paragraph 80 contains a legal conclusion to which no response is required. To the extent

a response is required, Corporate Defendants deny the same.

81.     The allegations contained in paragraph 81 of the Complaint are denied to the extent they

relate to Feature Films, C4C or Family Films.   Corporate Defendants are without sufficient

information or knowledge to form a belief as to the truth of the allegations contained in

paragraph 81 of the Complaint with respect to defendant Forrest Baker and therefore deny them.

82.     Paragraph 82 contains a legal conclusion to which no response is required. To the extent

a response is required, Corporate Defendants deny the same.

83.     The allegations contained in paragraph 83 of the Complaint are denied.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

84.     Plaintiff fails to state a cause of action on which relief may be granted.

### SECOND DEFENSE

85.     Corporate Defendants raise the affirmative defense of lack of venue.

### THIRD DEFENSE

86.     Plaintiff's claims are barred by the First and Fifth Amendments to the United States

Constitution.

14

## FOURTH DEFENSE

87.     Corporate Defendants raise the affirmative defense of the safe harbor protections of the TSR.

## FIFTH DEFENSE

88.     Corporate Defendants raise the affirmative defense of the doctrine of laches.

## SIXTH DEFENSE

89.     Corporate Defendants raise the affirmative defense of the statute of limitations.

## SEVENTH DEFENSE

90.     Corporate Defendants raise the affirmative defense of good faith .

## EIGHTH DEFENSE

91.     Corporate Defendants raise the affirmative defense of intervening cause.

## NINTH DEFENSE

92.     Corporate Defendants raise the affirmative defense of mistake.

## TENTH DEFENSE

93.     Corporate Defendants raise the affirmative defense of the lack of intent.

## ELEVENTH DEFENSE

94.     Corporate Defendants raise the affirmative defense of the charitable exemption.

## TWELVTH DEFENSE

95.     Plaintiff's claims are barred in as much as they are not covered by the TSR.

## THIRTEENTH DEFENSE

96.     Corporate Defendants raise the affirmative defense of truth.

## FOURTEENTH DEFENSE

97.     Corporate Defendants raise the affirmative defense of no reliance.

## FIFTEENTH DEFENSE

98.    Corporate Defendants raise the affirmative defense of failure to join indispensible parties.

## SIXTEENTH DEFENSE

99.    Corporate Defendants raise the affirmative defense of failure to plead fraud with specificity.

## SEVENTEENTH DEFENSE

100.    Corporate Defendants raise the affirmative defense that Plaintiff's claims and interpretations of the law constitute  arbitrary and capricious agency action, and are an abuse of discretion under the Administrative Procedure Act.

## EIGHTEENTH DEFENSE

101.    Corporate Defendants raise the affirmative defense that Plaintiff's claims are contrary to law.

## COUNTERCLAIMS

Counterclaimants C4C, Feature Films, Family Films and Forrest S. Baker, III allege as follows:

1.    Counterclaimants bring these claims against the United States of America (the "Government") to protect their rights and those of the charities and non-profits they assist. Counterclaimants seek declaratory relief to protect rights under:  (a)  the First and Fifth Amendments to the United States Constitution; and (b) the Administrative Procedure Act ("APA").  The Government's interpretation and implementation of the Telephone Consumer Protection Act ("TCPA"), the  Federal Trade Commission Act (the "FTC Act"), and the Telemarketing Sales Rule ("TSR") unlawfully restrain noncommercial speech, violate due process, and are arbitrary and capricious under the APA.

## I.      PARTIES

2.   Counterclaimant C4C is a Utah limited liability company, with its principal place of business in Murray, Utah.   C4C is a professional fundraiser that works on behalf of charitable and nonprofit organizations.  Among other services, C4C provides "telefunding" services on a contract basis for nonprofit organizations to accomplish advocacy and fundraising objectives on their behalf.  C4C is a small business that employees approximately 65 people in Utah.

3.   Counterclaimant Feature Films is a mission-oriented film company, with its principal place of business in Murray, Utah, that produces, markets and sells—primarily through telemarketing and partnerships with like-minded advocacy groups—family-friendly movies that do not contain violence, nudity, or profanity and promote traditional family values.

4.   Counterclaimant Family Films is a management company, with its principal place of business in Murray, Utah,  that provides certain management services to C4C and Family Films.

5.   Counterclaimant Forrest S. Baker, III is the president and chief executive officer Counterclaimant Feature Films, and the chief executive officer of Family Films.

6.   The Federal Trade Commission ("FTC") is an independent administrative agency of Counterdefendant United States of America, created by Congress and operated under the Federal Trade Commission Act, 15 U.S.C. §§ 41 *et seq*. ("FTC Act).

## II.      JURISDICTION AND VENUE

7.   This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 702 and 704, 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 28 U.S.C. § 2201.

8.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).

### III.  GENERAL ALLEGATIONS

9.   America has always supported private efforts to do good and organize for political, religious, or charitable purposes.  From our country's earliest beginnings, it was recognized that "the Americans make associations to give entertainment, to found seminaries, to build inns, to construct churches, to diffuse books, to send missionaries to the antipodes; in this manner, they found hospitals, prisons and schools."  A great source of the strength of the American people is that we choose to privately organize to self-improve, help our neighbors, advocate, and pursue private or public welfare.

10. Today, there are over 920,000 charitable and non-profit organizations in the United States registered with the Internal Revenue Services.  *See* IRS Publication 78, *Cumulative List of Organizations Described In Section 170(c) of the Internal Revenue Code of 1986* (Jan. 14, 2011). These organizations run a huge gamut of purposes and approaches.  Such organizations include the American National Red Cross, the United Way, local Elks organizations, fraternal orders of police, local PTAs, the Girl Scouts, the YMCA, the National Association for the Advancement of Colored People, the AARP, and the Sierra Club to name just a small handful.

11. The importance of charities and nonprofits is formally recognized by the Government.  For example, nonprofit organizations can be granted preferential tax treatment. Likewise, under the FTC Act, the Government lacks jurisdiction over nonprofits.  The FTC Act only applies to "persons, partnerships, or corporations," 15 U.S.C. § 45(a)(2), and defines "corporation" as an entity that "is organized to carry on business for its own profit or that of its members," 15 U.S.C. § 44.  Indeed, the solicitation of contributions by nonprofit associations is not trade or commerce.

18

12. Like any private organization, charities and nonprofits require funds to exist.  They raise such funds through a variety of means, including dues, fundraising, grants, sales of goods and services, auctions, carwashes, bake sales, membership drives and other means.

13. For charitable and nonprofit organizations that fund themselves primarily or solely through fundraising efforts, fundraising is the lifeblood of the organization and without the ability to profitably raise funds, such organizations cannot exist.  Often such fundraising efforts require significant effort or expense on the part of charities and non-profits and the costs of such efforts can be a substantial expense for such organizations.  Moreover, during the recent economic downturn, it has become harder to raise funds from the general public.  Nonetheless, fundraising is critical and often has the added benefit of helping spread a specific organization's message, raise public awareness, and solicit non-monetary support from interested and like-minded individuals.  Because of the importance of fundraising, charities and non-profits can and often do use commercial firms to assist in their efforts.

14. One such non-profit organization is the Coalition for Quality Children's Media, a national, nonprofit organization, founded in 1991, whose mission is to teach children critical viewing skills and to increase the visibility and availability of quality children's media, which primarily does business through the trade name Kids First  ("Kids First").  Its website is www.kidsfirst.org.

15. Kids First evaluates, rates and endorses children's films, DVDs, CDs, TV shows and games using volunteer, community-based juries of adults and children from diverse backgrounds and offers a variety of means to showcase and enhance consumer awareness of sponsored products.  Kids First is widely supported by teachers, librarians, media professionals, lobbyists, policymakers, child advocates, educators, parents and families nationwide.   Kids First is so

widely recognized as a reliable advocate for children's media that it has recently partnered with Toys "R" Us—at Toys "R" Us' request—to have a section in Toys "R" Us stores of recommended films.

16. In or around 2006, Kids First partnered with Counterclaimant Feature Films, with whom C4C is associated.  While Feature Films is a for-profit company, it is also a mission-driven organization and has complementary goals to Kids First in promoting value-based media. Because of the mutual interests and goals of the two organizations, Baker, the President and CEO of Feature Films, devised a charitable program with Kids First in which the two organizations jointly would provide family-friendly films and DVD technology to children's hospitals so sick and injured children who were hospitalized for extended periods of time and their parents and families would have a ready and large amount of family-friendly entertainment at hand.  The agreement governing the charitable program required that 93% of the money raised be used to off-set the cost of the films to go into the hospitals. While many thousands of DVDs were donated to hospitals, the program had limited success due to problems with the technology, high program costs, and a lack of funding.

17. In September of 2008, Kids First and this time, C4C, agreed to partner together to promote family-friendly entertainment.  C4C agreed to serve as Kids First's agent and conduct advocacy and charitable calls on Kids First's behalf.  Already familiar with the characteristics and content of Family Films' products from the 2006 hospital partnership, Kids First also reached an agreement with Feature Films for Feature Films to exclusively provide family-friendly DVDs to be used by Kids First as part of the program. Feature Films agreed to provide the DVDs at below-wholesale cost.  Kids First intended to use these DVDs both as free give-a-ways and as incentives for charitable solicitations, in order to get families to think about the

20

qualities that are important in children's media, to create a larger base of parents willing to participate as reviewers, and to create a recommended viewing list as part of the calls.

18. Because of the costs of labor, phone lines, and other out-of-pocket expenses, seeking charitable contributions via the telephone is and has historically been an expensive endeavor for charities. C4C, however, has developed cutting edge technology that has the potential to reduce greatly the overall costs of such messaging and fundraising. Part of C4C's mission is to use its advanced telephone technology to deliver a higher percentage of raised funds to charities and nonprofits than any other paid telephone solicitor. Nonetheless, the hard costs of the Kids First calls—which included providing free DVDs to potential supporters' homes—was estimated to be and turned out to be substantial. Thus, using a contract modeled after the hospital program agreement, Kids First was to receive 100% of the proceeds of any successful funding raising efforts, but was required to reimburse Feature Films up to no more than 93% of the revenues to off-set the hard costs, including those associated with providing the DVDs. C4C agreed to do the calls without monetary compensation and to volunteer its employees' time.

19. Initially, Kids First contacted families throughout the United States via telephone to inform them about Kids First's charitable programs and invite them to initially just serve as Kids First volunteers to help create a recommended viewing list of family-friendly films. Families that agreed to serve as Kids First volunteers were sent two free, family-friendly movies on DVDs clearly identified with the Kids First logo and were asked to watch the DVDs and further agree to receive a second telephone call to answer questions about their experience.

20. These telephone calls were widely made, including to telephone numbers listed on the National Do Not Call Registry. The National Do Not Call Registry ("DNC") is a nationwide list

of telephone numbers maintained by the FTC pursuant to the TSR.  Consumers may register their telephone number on the DNC to limit, but not eliminate, the number of calls they may receive.

21. Significantly, the TSR does not prohibit the following types of telemarketing or other calls to telephone numbers listed on the DNC:  calls from or on behalf of political organizations; calls from charities; call from telephone surveyors; calls from call companies with whom the consumer has an existing business relationship; calls where there has been a prior financial transaction between the consumer and a business; and, call from companies to whom the consumer has provided express agreement to receive calls.

22. However, the FTC provides misleading information to consumers upon signing up for the DNC about what types of telephone calls are and are not covered.  Specifically, the FTC states that "[t]he National Do Not Call Registry gives you a choice about whether to receive telemarketing calls at home," without informing consumers that calls from charities are exempt from the DNC.  This misinformation campaign by the FTC has a chilling effect on charitable donations because it fosters a belief in consumers that charities are dishonest and breaking the law when they attempt to fundraise using the telephone, even though telephone calls seeking charitable donations are perfectly legal.

23. Indeed, the FTC bemoans the fact that is lacks jurisdiction over nonprofits under the FTC Act, stating elsewhere to consumers that the only reason charitable telephone calls are not prohibited by the TSR is because of "limitations in the jurisdiction of the FTC."  These limitations, of course, are imposed by the U.S. Constitution and the rule of law.

24.  The initial set of calls provided information about Kids First and asked for a charitable donation of volunteer participants' time.  Because a donation of time is a donation of a "thing of value," these calls arguably fall under the TSR's definition of telemarketing.  *See* 16

C.F.R. § 310.2(f) & (cc).  However, because the calls were issue advocacy mixed with a solicitation for the charitable contribution of time, they were exempt from the DNC requirements of the TSR.  16 C.F.R. § 310.6(a).

25. People who agreed to volunteer their time and received free movies were called again, typically a few weeks later.  Kids First asked the volunteers several questions about the movies they had watched designed to help Kids First complete a recommended viewer list of family-friendly films.  Kids First also invited its volunteers to support this Kids First project by purchasing two additional family-friendly films for $12.95.  Kids First explained that the proceeds would go to help fund the program and complete the process of creating the recommended viewing list, which necessarily included the cost of the calling campaign itself (long distance telephone calls, postage, and the manufacture of DVDs).

26. Part of the reason that Kids First modeled its campaign in this manner was based on C4C's prior experience working with charities, during which C4C noticed that offering to actively do something good for potential donors prior to asking for a donation led to better success in fundraising.  Kids First also had additional plans to further develop the list of contacts it created during the campaign and to even potentially become a membership organization.

27. The follow-up telephone call was only made to individuals who had agreed to receive the movies and follow-up call.  Some of these telephone numbers were listed on the National Do Not Call Registry.  Because the family-friendly DVDs were provided as a symbolic (and highly germane) incentive to solicit charitable contributions to an organization that advocates for quality children's media, the follow-up calls were exempt from the National Do Not Call Registry provision of the TSR. 16 C.F.R. § 310.6(a).

28. In fact, the Government has previously taken the position that calls of this nature are charitable, stating that "when [a] transaction predominantly is an inducement to make a charitable contribution, such as when an incentive of nominal value is offered in return for a donation, the telemarketer should proceed as if the call were exclusively to induce a charitable contribution." *See* Telemarketing Sales Rule, 68 Fed. Reg. 19, 4590 (Jan. 29. 2003).

29. It is understandable, for example, that donation of $1 to charity from the purchase price of a good sold over the telephone in an otherwise for-profit transaction would not transform that telephone solicitation into a charitable one exempt from the DNC provision of the TSR. That is, if a car dealer were attempting to sell $30,000 cars via the telephone and donate $1 to a charity for each car sold, such a call still has an overwhelming commercial nature.

30. On the other hand, if a Girl Scout used the telephone to solicit a charitable donation through cookie sales to her grandmother in another state, the DNC prohibitions simply should not apply because the money raised is still a charitable contribution to the Girl Scouts under federal law.

31. In any case, any and all follow-up calls made on behalf of Kids First were exempt at the time they were made from the National Do Not Call Registry provision of the TSR because the individuals who had agreed to receive the calls had an established business relationship with C4C by virtue of being offered, accepting and receiving the free movies, which is a financial transaction. 16 C.F.R. § 310.4(b)(1)(B)(ii).

32. The purpose of the Kids First calling campaign was not limited to raising funds for Kids First, but was intended to achieve a variety of charitable objectives. As stated in Kids First's contract with C4C, the objectives of the campaign were to "educate the public about Kids First's identity, mission and goals; identify homes willing to screen family DVDs; conduct

surveys and research, and gather statistics and information about how families feel about the content of entertainment media; and raise funds to be used in pursuing Kids First's mission and goals."

33. Kids First's charitable solicitation campaign was a success for Kids First.  After paying the costs of conducting the fundraising, which, pursuant to their contract, were at or near the manufacturing cost of $5.50 per film shipped for the DVDs and fulfillment services provided by Feature Films, Kids First retained approximately $63,000 in charitable donations raised through the calling campaign.

34. In comparison, Feature Films made no profit on the effort.  All of the money reimbursed by Kids First to Feature Films went to actual costs, including the cost of long distance and phone lines and the manufacture of almost 400,000 DVDs, and the fulfillment costs of shipping the approximately 312,000 free DVDs that were sent to people who indicated they were interested in family-friendly movies.

35.  The campaign not only raised significant funds for Kids First, it also furthered a number of Kids First's charitable goals.  In the course of the campaign, Kids First educated hundreds of thousands of families throughout the United States about its charitable mission; developed a national network of volunteers; distributed free, family-friendly DVDs to hundreds of thousands of homes; developed a list of potential future volunteers, members, or donors; and enabled families to access additional family-friendly DVDs approved by Kids First.  In short, Kids First's charitable solicitation campaign fulfilled the goals set forth in Kids First's agreement with C4C, and furthered Kids First's charitable mission of increasing the visibility and availability of quality children's media.  It also made Kids First a more widely-recognized

organization, resulting in Toys "R" Us asking Kids First to partner with it to create a section of Toys "R" Us stores with family-friendly movies recommended by Kids First.

36. The Supreme Court has recognized that charitable organizations engage in charitable solicitation campaigns not only to raise money to support their charitable activities, but also to publicly express their views on important social issues.  As a result, the Supreme Court has repeatedly held that charitable organizations have a constitutional right to promote their views through charitable solicitation campaigns.

37. Given the interrelationship between charitable solicitation and protected speech, the Supreme Court has held that charitable solicitation campaigns cannot be regulated in the same way as ordinary commercial speech, and any regulation of charitable solicitation campaigns must be "narrowly drawn" to avoid unduly burdening First Amendment freedoms.

38. The TSR inherently recognizes these important Constitutional protections as well by creating an exemption from the National Do Not Call Registry provisions for charitable solicitations.  *See* 16 C.F.R. § 310.6(a).  Hence, telemarketing calls made by professional fundraisers on behalf of nonprofit organizations may be made to telephone numbers listed on the National Do Not Call Registry.  *Id.*

39. In May 2009, Feature Films received a voluntary letter request from the FTC seeking information, data and interrogatory responses related to, among other things, its participation in the Kids First campaign.

40. In February 2010, the FTC issued a Civil Investigative Demand to C4C demanding information related to, among other things, the Kids First campaign.

41. During the course of its investigation, the FTC Staff stated that the Kids First campaign was not entitled to the exemption in the TSR for charitable calls related to the National

26

Do Not Call Registry because it considered the provision of the family-friendly DVDs on the second call to constitute a "sale" rather than a charitable contribution.  The FTC also made clear its position that each telephone call in violation of the TSR carried with it the possibility of steep civil penalties, possibly up to $16,000 per call.

42. The FTC Staff informed Counterclaimants that the FTC's position was that if a "sale" of any good or service occurred during a fundraising call, that call would not be an exempt charitable call even if all the proceeds went to the charity.  More specifically, FTC Staff said that if the Girl Scouts called any number of the National DNC registry in an effort to sell cookies to raise funds for the Girls Scouts, the FTC Staff would recommend a lawsuit against the Girl Scouts and seek a civil penalty of up to $16,000 per call.  Presumably, the FTC Staff would take the same position for any similar call made by the American National Red Cross, the United Way, local Elks organizations, fraternal orders of police, local PTAs, the YMCA, the National Association for the Advancement of Colored People, the AARP, and the Sierra Club to name just a small handful charities and non-profits.

43. As a direct result of the positions taken by the Government and the threat of enforcement action and penalties for past and future calls, C4C was forced to stop the campaign it was conducting on behalf of Kids First, and Feature Films was forced to end its contractual relationship with Kids First.

44. On December 13, 2009, in a letter to FTC Staff, C4C's attorney explained that C4C had suspended its calls on behalf of Kids First because of the Government's investigation, enclosed a copy of the scripting for the calls, and asked for clarification from the FTC that such calls do not violate the TSR.

27

45. On December 18, 2009, the FTC responded, refused to provide clarification about the legality of the calls, and instead suggested—in completely circular fashion—that C4C should not "resume, continue or initiate" any calls on behalf of Kids First or any other charity on the premise that the calls are exempt from telemarketing or from the Telemarketing Sales Rules "unless [C4C] has a sound factual and legal basis for its conclusion."

46. C4C, on behalf of various fraternal orders of police ("FOPs"), which are nonprofits and charities, engaged as an agent making telephone calls advocating on their behalf and raising funds.  Similar to the positions taken with regard to the speech on behalf of Kids First, the Government has taken unreasonable, arbitrary and capricious positions of law and threatened and imperiled such speech.

47. On or around March 14, 2011, the five Commissioners of the FTC voted to authorize a lawsuit to be filed against C4C, Feature Films, Family Films, and Baker.

48. On or around May 5, 2011, the Department of Justice, acting on behalf of the FTC, filed the present lawsuit in this District.

49. Given this clear prior restraint on C4C's First Amendment rights to noncommercial speech on behalf of Kids First and/or various FOPs, Counterclaimants seek a declaratory judgment that the Government is violating Counterclaimants' rights and the rights of Kids First and/or various FOPs under the Due Process Clause, that the Government is violating Counterclaimants' rights and the rights of Kids First and/or various FOPs to free speech, and that the Government's actions are in violation of the APA.

50. Counterclaimants do not contest the Government's power to investigate and challenge violations of the TSR and violations of Section 5 of the FTC Act.  Rather, Counterclaimants

bring these counterclaims for declaratory relief because of the Government's unconscionable conduct.

51. Using the systematic threat of coercive action and steep monetary penalties—and indeed actual litigation—under its arbitrary, capricious and unlawful implementation of the TSR and Section 5 of the FTC Act, the Government has unlawful placed a prior restraint on Counterclaimants' freedom of speech.

52. Because of the Government's prior restraint on Counterclaimants' freedom of speech, Kids First has thus been unable to deliver its advocacy message or conduct charitable fundraising in the manner of its choosing. Kids First has also been chilled in its plans to conduct future advocacy campaigns using the list of contacts of like-minded citizens it developed during the course of its calling campaign.

53. In particular, the Government contends that the Do Not Call Registry provisions of the TSR apply to the Kids First campaign, and that Kids First or its agents made false and misleading statements about the purpose of the calls and the use of donations. These contentions are outrageous and wrong.

54. Counterclaimants have been further chilled in their efforts to assist other nonprofits and charities, specifically various FOPs, in those organizations' advocacy and fundraising efforts as Counterclaimants are able to and prepared to support similar advocacy and fundraising efforts in the future for other organizations but are deterred from doing so because of the Government's threats and coercion.

55. First Amendment protections for charitable organizations that engage in charitable solicitation campaigns apply here, as there are important speech rights intertwined with the solicitation of charitable contributions.

56. The First Amendment also protects a nonprofit's compensation arrangement with its agents.  Costs incurred by charitable organizations in the context of charitable solicitation campaigns can vary dramatically, and there is no nexus between percentage of funds retained by the fundraiser and the likelihood that the solicitation is fraudulent.  The Supreme Court has routinely struck down government attempts at cost-based limitations on charitable solicitation campaigns as unconstitutional.  Yet the Government has imposed just such a limitation here.

## STANDING

57. Counterclaimants have standing to bring this action for the following reasons:

   a.  C4C and Feature Films served as the agents of Kids First for purposes of conducting a charitable calling campaign that included advocacy and fundraising and Counterclaimants bring these counterclaims both on their own behalf and on behalf of Kids First;

   b. C4C served as the agent for various FOPs for purposes of conducting charitable calling campaigns that included both advocacy and fundraising and Counterclaimants bring these counterclaims both on its own behalf and on behalf of various FOPs;

   c. Family Films provided management services to C4C and Feature Films during the time period of the Kids First charitable calling campaign and calling campaigns for various FOPs and was financially dependent on the same;

   d. The Government's unlawful interpretation and implementation of the TSR and Section 5 of the FTC Act have unduly burdened, and, will continue to unduly burden, Counterclaimants, Kids First's, and the various FOPs' rights of due process and free speech;

   e. The Government's threats and acts have directly chilled and suppressed protected speech and caused Counterclaimants financial and other direct harm; and

   f. Counterclaimants are uncertain about their rights and obligations under the TSR and Section 5 of the FTC Act, necessitating declaratory relief: (i) to vindicate Counterclaimants' rights; (i) to avoid prosecution of Counterclaimants' exercise of a fundamental liberty; and (iii) to provide certainty to Counterclaimants and other companies that assist nonprofit organizations.

58. The FTC's interpretation of the TSR and Section 5 of the FTC Act, including the formal action of the Commission voting in favor of filing a lawsuit against Counterclaimants,

constitutes final agency action.  The FTC's interpretation is a definitive decision of the Commission by which the rights and obligations of telefunders and the charities they represent are determined, and from which legal consequences flow.  The Government—acting through and on behalf of the FTC— bases its law enforcement actions on an arbitrary and capricious standard, treats its arbitrary and capricious standard as controlling, refuses to provide any clarity or guidance on what conduct is permissible under its arbitrary and capricious standard, uses its arbitrary and capricious standard to violate the First Amendment and suppress free speech, expects compliance with its arbitrary and capricious standard, and takes coercive action against telefunders engaged in charitable fundraising campaigns on behalf of nonprofit groups that the Government contends do not comply with the law.

59. There currently exists an actual and justiciable controversy between the parties regarding the constitutionality of the Government's conduct, the scope of the Government's authority, and the meaning of United States statutes and FTC regulations.

60. Declaratory relief will resolve this controversy and is necessary to eliminate the immediate effect that the Government's interpretations of the law have had on Kids First's and the various FOPs' advocacy and fundraising.  Declaratory relief is also necessary to eliminate the chill that the Government's interpretations of the law have had and continue to have on Counterclaimants' and Kids First's and the various FOPs' First and Fifth Amendment rights.

## COUNT ONE

### Declaratory Relief
### The Government is Violating Counterclaimants' Freedom of Speech and Right to Due Process

61. Counterclaimants incorporate each and every preceding paragraph by reference as though fully set forth herein.

62. The Government has pursued enforcement action against Counterclaimants based on charitable calling that has chilled the free speech of Counterclaimants and nonprofits and charities and has deprived Counterclaimants of their rights and property interests without due process of law.

63. Pursuant to 28 U.S.C. §§ 2201, this Court may declare the rights and legal relations of the parties and grant further necessary or proper relief based on its declaration.

64. The telephone calls that C4C made on behalf of nonprofits and charities consisted of issue advocacy mixed with a request for a charitable donations.

65. Both advocacy and charitable fundraising are highly protected forms of speech under the First Amendment. This noncommercial speech enjoys greater protections than does commercial speech under the First Amendment, and is entitled to heightened First Amendment scrutiny.

66. The Government's enforcement action against Counterclaimants is unsupported by the law, does not further an important government interest, nor is it substantially related to an important government interest.  To the contrary, the federal government supports and encourages charitable contributions by creating special tax exemptions and other special legal privileges for nonprofits, including specific exemption from the National DNC.

67. Moreover, before conducting the charitable campaign on behalf of nonprofits and charities, Counterclaimants had no notice that the Government would adjudge their conduct to run afoul of the law.

68. Before prosecuting Counterclaimants, the Government refused to inform Counterclaimants of the standards it applied in adjudging what is permissible under the TSR and Section 5 of the FTC Act.

69. Indeed, despite official pronouncements of FTC policy to the contrary, the Government arbitrarily adjudged C4C's campaign on behalf of nonprofits and charities to be non-charitable in nature, despite it not being within FTC's jurisdiction or discretion to second guess the Internal Revenue Service.

70. The Government's enforcement action against Counterclaimants is an improper prior restraint on protected speech in violation of the First Amendment and prevents Counterclaimants and nonprofits and charities on whose behalf C4C engaged in protected speech from transmitting their advocacy messages, from charitable solicitation, and from all future use involving the telephone of the contact list of like-minded citizens developed during the course of the charitable calling campaigns.

71. The Government's interpretation of the TSR and Section 5 of the FTC Act violates Counterclaimants' rights to due process because before Counterclaimants engage in a fundraising campaign for Kids First or for any other nonprofit organization, there is no way for Counterclaimants to know whether they will violate the TSR or FTC Act because the Government's standards are unconstitutionally vague.

72. As Counterclaimants have been compelled to stop their protected noncommercial speech, without due process of law, because of the Government's enforcement activity, there exists no adequate remedy other than that requested herein.

**<u>COUNT TWO</u>**

**The Government Has Violated the Administrative Procedure Act By Taking Action that Is Arbitrary, Capricious, and Contrary to Law**

73. Counterclaimants incorporate each and every preceding paragraph by reference as though fully set forth herein.

74. Pursuant to 5 U.S.C. § 706(2)(A), a reviewing court shall hold unlawful and set aside agency action found to be "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law."

75. Pursuant to 5 U.S.C. § 706(2)(B), a reviewing court must hold unlawful and set aside agency action found to be "contrary to constitutional right, power, privilege, or immunity."

76. The Government—acting through and on behalf of the FTC—has acted arbitrarily, capriciously, and contrary to law in its enforcement action against Counterclaimants.  The Government has taken positions contrary to the TSR and to its own policies, has ignored its own rulemaking procedures required for its actions to be valid, and is now asserting new positions for purposes of purported litigation that violate Constitutional rights.

77. The Government's newly adopted positions constitute final agency action within the meaning of 5 U.S.C. § 704.

78. An actual and justiciable controversy exists between the parties, for which there exists no adequate remedy other than that requested herein.

## COUNT THREE

### Equal Access to Justice Act
### The Government's Enforcement Action is Not Substantially Justified
### and Has Been Pursued in Bad Faith

79.    Counterclaimants incorporate each and every preceding paragraph by reference as though fully set forth herein.

80.    Pursuant to 28 U.S.C. § 2412(d)(1)(A), where the United States is not substantially justified in its position, including in prelitigation conduct, the court must make an award costs, fees, and expenses to the prevailing party.

34

81.     Here, the Government's enforcement activity against Counterclaimants related to the Kids First charitable calling campaign is unjustified, unexplained, and wholly without reasonable basis either in law or in fact.

82.     The Government's behavior during the course of litigation cannot serve to offset or "cure" prelitigation conduct that was conducted in bad faith.

83.     For all of these reasons, Counterclaimants are entitled to all costs, fees, and expenses associated with bringing the present counterclaims to the fullest extent allowed by 28 U.S.C. § 2412

**PRAYER FOR RELIEF**

WHEREFORE, Counterclaimants C4C, Feature Films, Family Films, and Baker respectfully pray for relief and judgment as follows:

(1) That the Court render a Declaratory Judgment declaring that:

    (a) C4C was acting as Kids First's agent for the calls in question and the calls must be analyzed as calls made on behalf of Kids First, a non-profit advocacy organization;

    (b) A call made on behalf of a non-profit is exempt from the national DNC prohibition TSR if made to solicit a charitable contribution (a "charitable call");

    (c) A call asking for citizens to volunteer their time is an exempt charitable call;

    (d) Kids First calls asking citizens to volunteer their time to watch and rate family-friendly movies were exempt charitable calls under Section 310.6(a) of the TSR;

(e)  Giving citizens free goods, such as DVDs, does not transform an exempt charitable call into a commercial call;

(f)  Giving citizens money, a monetary discount, or free goods, such as DVDs, are all financial transactions under the TSR;

(g)  An exempt charitable call is not transformed into a commercial call simply because it leads to later calls that may not be exempt;

(h)  The first set of call made by Kids First did not become non-exempt calls because the same numbers were later called and asked to purchase DVDs;

(i)  A charity or non-profit may seek a charitable contribution under the TSR in the form of the sale of goods or services;

(j)  Kids First sought charitable contributions by asking citizens to purchase DVDs to support Kids First and its calling campaign;

(k)  An exempt charitable call does not lose its exemption because as a result of the call there is a direct or indirect financial benefit a separate commercial entity, such as a telefunder, a supplier, the telephone company or the U.S. Postal Service;

(l)  A call made on behalf of a charity or non-profit does not become a commercial call simply because the costs of making the call are high and a commercial telefunder is reimbursed for its efforts;

(m) Calls in which Kids First sought contributions through the sale of DVDs were exempt from the national DNC prohibitions; and

(n)  C4C calls on behalf of Kids First are constitutionally protected, were legal, met the requirements of the TSR, and that future calls made in the same

manner would also be protected from unlawful and arbitrary and capricious law enforcement threats and actions by the Government.

(2)    The Court will dismiss all claims by the Government against Counterclaimants related to charitable calling campaigns because the Government's enforcement action is arbitrary, capricious, and contrary to law;

(3)    The Court will award Counterclaimants all costs, fees, and expenses associated with bringing the present counterclaims to the fullest extent allowed by 28 U.S.C. § 2412;

(4)    The Court will award Counterclaimants reasonable attorneys' fees, costs and all other fees under all other applicable laws; and

(5)    The Court will award such other and additional relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Demand is made for a jury trial.

Respectfully submitted,

Dated: November 14, 2011

By: _____/s/ Daniel Ferrel McInnis

| | |
|---|---|
| Peter Antonacci -Florida Bar No. 280690 | Daniel Ferrel McInnis |
| Timothy M. Cerio – Florida Bar No. 76589 | Allison Sheedy |
| Allen Winsor -Florida Bar No. 016295 | AKIN GUMP STRAUSS HAUER & FELD, LLP, |
| GRAY-ROBINSON, P.A. | 1333 New Hampshire Ave, NW |
| 301 South Bronough St. | Washington, D.C. 20036 |
| Tallahassee, FL 32301 | Phone: (202) 887-4000 |
| Tel: 850-577-9090 | Fax: (202) 887-4288 |
| Fax: 850-577-3311 | |

*Attorneys for Defendants and Counterclaimants Feature Films for Families, Inc., Corporations for Character, L.C., and Family Films of Utah, Inc.*

37

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been furnished through the

Court's CM/ECF system this 14th day of November , 2011, to the following:


Pamela C. Marsh
United States Attorney
Peter Fisher
Assistant U.S. Attorney for the Northern
District of Florida
111 North Adams Street
Fourth Floor, U.S. Courthouse
Tallahassee, Florida 32301

Michael E. Tankersley
Arturo DeCastro
Attorneys
Federal Trade Commission
600 Pennsylvania Ave., NW, Rm. 286
Washington, DC
20580mtankersley@ftc.gov

Daniel M. Baeza
Trial Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
Dan.baeza@usdoj.gov

/s/ *Allen Winsor*
Allen Winsor